AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
10/6/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: KMA DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
10/07/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: cld DEPUTY

United States of America,
v.
Manuel Vaughns, Shaquanda Mason, Charles McIntyre, Creshana Mosley, Rodney Thomas aka "Jamaica", Dwayne Richards, Tyzarioun Grimsley, Davied Rivers, and Maceo George Henderson,
Defendants.

Case No. 2:26-mj-05846-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of March 19, 2026 through September 23, 2026, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute, and Distribution of, Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Dennis An*
*Complainant's signature*

Dennis An, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 10/07/2026

*Judge's signature*

City and state: Los Angeles, California

Hon. Christina T. Shay, U.S. Magistrate Judge
*Printed name and title*

AUSA: Barr Benyamin (x6772)

# AFFIDAVIT

I, Dennis An, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of criminal complaints and arrest warrants against (1) Manuel VAUGHNS ("VAUGHNS"), (2) Shaquanda MASON ("MASON"), (3) Charles MCINTYRE ("MCINTYRE"), (4) Creshana MOSLEY ("MOSLEY"), (5) Rodney THOMAS, also known as "Jamaica," ("THOMAS"), (6) Dwayne RICHARDS ("RICHARDS"), (7) Tyzarioun GRIMSLEY ("GRIMSLEY"), (8) Davied RIVERS ("RIVERS"), and (9) Maceo George HENDERSON (collectively, the "TARGETS"), for a violation of 21 U.S.C. § 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance).

2. This affidavit is also made in support of applications for warrants to search the following premises (collectively, the "SUBJECT PREMISES"):

a. 3112 Anasazi Way, Simi Valley, California, 93063, ("**SUBJECT PREMISES 1**"), as further described in **Attachment A-01**;

b. 1019 North Summit Avenue, Pasadena, California, 91103, ("**SUBJECT PREMISES 2**"), as further described in **Attachment A-02**;

c. 1829 E Workman Avenue, Apartment 22, West Covina, California, 91791, ("**SUBJECT PREMISES 3**"), as further described in **Attachment A-03**;

d. 625 South San Pedro Street, Apartment 418, Los Angeles, California, 90014 (“**SUBJECT PREMISES 5**”), as further described in **Attachment A-05;**

e. An encampment located on Crocker Street on the southeast corner of the intersection of 5th Street and Crocker Street (“**SUBJECT PREMISES 6**”), as further described in **Attachment A-06;**

f. 1200 South Figueroa Street, Unit W914, Los Angeles, California, 90015 (“**SUBJECT PREMISES 7**”), as further described in **Attachment A-07;**

g. A blue and grey encampment located on the west sidewalk on Crocker Street south of 5th Street (“**SUBJECT PREMISES 8**”), as further described in **Attachment A-08;**

h. 625 South San Pedro Street, Apartment 425, Los Angeles, California, 90014 (“**SUBJECT PREMISES 9**”), as further described in **Attachment A-09;**

i. 9413 South Spring Street, Unit 110, Los Angeles, California, 90003 (“**SUBJECT PREMISES 10**”), as further described in **Attachment A-10;**

j. A grey tent located on the west sidewalk on Crocker Street south of 5th Street (“**SUBJECT PREMISES 11**”), as further described in **Attachment A-11;**

k. 346 Hauser Boulevard, Apartment 2-411, Los Angeles, California 90036 (“**SUBJECT PREMISES 12**”), as further described in **Attachment A-12.**

3. This affidavit is also made in support of applications for warrants to search the following vehicles (collectively, the "SUBJECT VEHICLES"):

a. A dark blue 2010 Mercedes Benz bearing California license plate 9XMB550 ("**SUBJECT VEHICLE 1**"), as further described in **Attachment A-13;**

b. A 1976 recreational vehicle ("RV") bearing California license plate 7LPG305 ("**SUBJECT VEHICLE 2**"), as further described in **Attachment A-14;**

c. A Chevy Impala bearing California license plate 6EIGHT ("**SUBJECT VEHICLE 3**"), as further described in **Attachment A-15;**

d. An RV bearing California license plate 8BKU440 ("**SUBJECT VEHICLE 4**"), as further described in **Attachment A-16;**

e. A white 2004 Chevrolet van bearing California license plate 8YQD031 ("**SUBJECT VEHICLE 5**"), as further described in **Attachment A-17;**

f. A 2023 black Vanderhall three-wheeled vehicle bearing California license plate 26Y6683 ("**SUBJECT VEHICLE 6**"), as further described in **Attachment A-18;**

g. A white 2016 Bentley bearing California license plate 9WAJ613 ("**SUBJECT VEHICLE 7**"), as further described in **Attachment A-19;**

h. A dark colored 2022 Mercedes Benz bearing California license plate 9UHN389 ("**SUBJECT VEHICLE 8**"), as further described in **Attachment A-20;**

i. A gold 1993 Cadillac four door bearing California license plate 8LTY755 ("**SUBJECT VEHICLE 11**"), as further described in **Attachment A-23;**

j. A red 2015 Chevrolet Cruze bearing California license plate 9CHC777 ("**SUBJECT VEHICLE 12**"), as further described in **Attachment A-24;**

k. A red 1999 Lincoln Town Car bearing California license plate 9JTZ864 ("**SUBJECT VEHICLE 13**"), as further described in **Attachment A-25;**

l. A blue 2017 Mercedez Benz four door bearing California license plate 9UCZ293 ("**SUBJECT VEHICLE 14**"), as further described in **Attachment A-26;**

m. A black 2016 Chevrolet Tahoe sport utility vehicle bearing California license plate 9VNY376 ("**SUBJECT VEHICLE 15**"), as further described in **Attachment A-27;**

n. A white Honda bearing California license plate 9LEV742 ("**SUBJECT VEHICLE 16**"), as further described in **Attachment A-28;**

o. A white 2020 Chevrolet Malibu bearing California license plate 9LCC566 ("**SUBJECT VEHICLE 17**"), as further described in **Attachment A-36;** and

4. This affidavit is also made in support of applications for a warrant to search the following nine previously seized digital devices (collectively, the "SUBJECT DEVICES"), as described in **Attachment A-29:**

a. A black iPhone with scratches seized on or about April 23, 2026, from inside of a white 2004 Chevrolet van

bearing CA license plate 8YQD031, LAPD Case Number: 26079430, LAPD Evidence Item: 001-013 ("**SUBJECT DEVICE 1**");

b. A black iPhone with a black case seized on or about April 23, 2026, from inside of a white 2004 Chevrolet van bearing CA license plate 8YQD031, LAPD Case Number: 26079430, LAPD Evidence Item: 001-014 ("**SUBJECT DEVICE 2**");

c. A silver and black Cricket Wireless cellphone with a black and purple case seized on or about April 23, 2026, from inside of a white 2004 Chevrolet van bearing CA license plate 8YQD031, LAPD Case Number: 26079430, LAPD Evidence Item: 001-015 ("**SUBJECT DEVICE 3**");

d. A gray Boost Mobile cellphone with a black case seized on or about April 23, 2026, from inside of a white 2004 Chevrolet van bearing CA license plate 8YQD031, LAPD Case Number: 26079430, LAPD Evidence Item: 001-013 ("**SUBJECT DEVICE 4**");

e. A black Samsung cellphone with a black case seized on or about March 19, 2026, LAPD Case Number: 26054439, LAPD Evidence Item: 001-032 ("**SUBJECT DEVICE 5**");

f. A black iPhone with a black case seized on or about March 19, 2026, LAPD Case Number: 26054439, LAPD Evidence Item: 001-032 ("**SUBJECT DEVICE 6**");

g. A black Samsung cellphone with a black case seized on or about April 13, 2026, LAPD Case Number: 26072571, LAPD Evidence Item: 001-023 ("**SUBJECT DEVICE 7**");

h. A blue cellphone seized on or about April 13, 2026, LAPD Case Number: 26072571, LAPD Evidence Item: 001-024 ("**SUBJECT DEVICE 8**"); and

i. A gray Samsung cellphone seized on or about April 13, 2026, LAPD Case Number: 26072571, LAPD Evidence Item: 001-025 ("**SUBJECT DEVICE 9**").

5. The requested search warrants for **SUBJECT PREMISES 6** and **11**, and **SUBJECT VEHICLES 3**, **4**, and **5**, seek authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance) and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) (the "**Subject Offenses-1**"), as described more fully in **Attachment B-1.**

6. The requested search warrants for **SUBJECT PREMISES 1, 2, 3, 5, 7, 8, 9, 10,** and **12** and **SUBJECT VEHICLES 1, 2, 6, 7, 8, 11, 12, 13, 14, 15, 16,** and **17** seek authorization to seize evidence, fruits, and instrumentalities of violations of Title 21 U.S.C. § 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance), and 18 U.S.C. § 924(c)(1) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (the "**Subject Offenses-2**"), as described more fully in **Attachment B-2.**

7. The requested search warrants for the **SUBJECT DEVICES** seek authorization to seize evidence, fruits, and instrumentalities of violations of Title 21 U.S.C. § 841(a)(1)

(Possession with the Intent to Distribute, and Distribution of, a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance), and 18 U.S.C. § 924(c)(1) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime) (the "**Subject Offenses**"), as described more fully in **Attachment B-3.**

8. **Attachments A-01** through **A-03, A-05** through **A-20, A-23** through **A-29,** and **A-36,** and **Attachments B-1, B-2,** and **B-3** are incorporated herein by reference.

9. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

10. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since 2006. I am currently assigned to the Drug Enforcement Administration ("DEA") Los Angeles Field Office, Southern California Drug Task Force ("SCDTF"), High Intensity Drug Trafficking Area ("HIDTA") Group 44, where I investigate violations of federal law related to violent organized crime and racketeering, including assault, murder, robbery, burglary, gang activity, fraud by wire, access

device fraud, aggravated identity theft, money laundering, weapons violations, and drug trafficking in the Central District of California. I completed a 17-week course at the FBI Academy in Quantico, Virginia, during which I received training in conducting investigations into violations of federal laws. Prior to joining the FBI, I was an officer in the United States Army.

11. My experience working as an FBI SA includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, authoring search warrants, executing search and arrest warrants, and managing informants. I have received training in, and am experienced in, the investigation of violations of federal law, including violations of federal weapons and drug conspiracy laws. I have participated in several gang investigations involving the organized distribution of illegal drugs.

## III. SUMMARY OF PROBABLE CAUSE

12. Beginning in July 2026, the Southern California Drug Task Force ("SCDTF") High Intensity Drug Trafficking Area ("HIDTA"), working with the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco and Firearms ("ATF"), the Internal Revenue Service Criminal Investigations ("IRS-CI"), the United States Marshals Service ("USMS"), the Los Angeles Police Department ("LAPD") Central Division, the Los Angeles County Sheriff's Department ("LASD"), the California Highway Patrol ("CHP"), and the Santa Monica Police Department ("SMPD"), initiated an investigation into the trafficking of

controlled substances occurring in and around the Skid Row area of Downtown Los Angeles for the purpose of identifying distributors, gathering evidence, and charging distributors and sources of supply of drugs. The joint effort to investigate and target Skid Row drug dealers has been named "OPERATION SAVE SKID ROW." This investigation was conducted through multiple methods of surveillance, including the use of buy/walk[1] and buy/bust[2] operations and the strategic use of uniformed officers to conduct stops of targets after buy/walks to identify them. Confidential sources were used to conduct the buy/walk and buy/bust operations. The investigation also involved the identification of prior drug distribution offenses conducted by any of the Targets.

13. Below is a summary table of narcotics evidence seized since March 19, 2026:

[1] A buy/walk operation is an undercover law enforcement tactic used where an undercover officer or confidential source purchases illegal drugs from a suspect but the suspect is not immediately arrested.

[2] A buy/bust operation is an undercover law enforcement tactic used where an undercover officer or confidential source purchases illegal drugs from a suspect and the suspect is arrested following the purchase.

| Date | Target Name (Type of Operation) | Transaction Amount | Drug Testing and Pending Results | CS/UC used |
|---|---|---|---|---|
| 3/19/26 | THOMAS (Search Warrant) | N/A | 242.21 grams of a mixture and substance containing cocaine base;<br><br>500.08 grams of a mixture and substance containing cocaine; Laboratory results pending (suspected cocaine base) | N/A |
| 4/14/26 | RICHARDS (Search Warrant) | N/A | 1,006.71 grams of a mixture and substance containing cocaine; 394.0 grams of a mixture and substance containing cocaine base; 5.09 grams of a mixture and substance containing cocaine base; 10.51 grams of a mixture and substance containing cocaine base 11.57 grams of a mixture and substance containing cocaine base | N/A |

| Date | Target Name (Type of Operation) | Transaction Amount | Drug Testing and Pending Results | CS/UC used |
|---|---|---|---|---|
| 4/23/26 | MCINTYRE and MOSLEY (Buy/Bust) | $120 | 2.89 grams of a mixture and substance containing cocaine base;<br>Laboratory results pending (suspected cocaine base);<br>Laboratory results pending (suspected cocaine base);<br>108.8 grams of pure methamphetamine | CS-1 |
| 7/30/26 | VAUGHNS (Buy/Bust) | $60 | 2.02 grams of a mixture and substance containing cocaine base | CS-1 |
| 7/30/26 | MASON (Buy/Walk) | $60 | 2.18 grams of a mixture and substance containing cocaine base | CS-1 |
| 8/5/26 | MCINTYRE (Buy/Walk) | $50 | Laboratory results pending (suspected cocaine base) | CS-2 |
| 8/5/26 | THOMAS (Buy/Walk) | $60 | Laboratory results pending (suspected cocaine base) | CS-2 |

| Date | Target Name (Type of Operation) | Transaction Amount | Drug Testing and Pending Results | CS/UC used |
|---|---|---|---|---|
| 8/19/26 | GRIMSLEY (Buy/Walk) | $75 | 2.63 grams of a mixture and substance containing cocaine base | CS-2 |
| 8/26/26 | RIVERS (Buy/Bust) | $20 | 0.22 grams of a mixture and substance containing fentanyl | CS-3 |
| 9/3/26 | HENDERSON (Arrest) | N/A | 21.89 grams of a mixture and substance containing cocaine base;<br><br>2.27 grams of a mixture and substance containing cocaine base | N/A |

## IV. STATEMENT OF PROBABLE CAUSE

14. Based on my conversations with other law enforcement agents and my own knowledge of the investigation, I am aware of the following:

### A. Background on Skid Row

15. Skid Row is located in the city of Los Angeles, California, specifically within the Downtown area of Los Angeles. Skid Row is in a sector of the city characterized by high rates of poverty and homelessness. Many of the homeless in the area are drug users, and Skid Row is a known location to purchase user quantities of drugs, including cocaine base,

methamphetamine, phencyclidine – commonly known as "PCP," – and fentanyl.

16. The following streets serve as Skid Row's borders:

a. 3rd Street runs from southeast to northwest, serving as the northern border of Skid Row;

b. 8th Street runs from southeast to northwest, serving as the southern border of Skid Row;

c. Main Street runs from southwest to northeast, serving as the western border of Skid Row; and

d. Central Avenue runs from southwest to northeast, serving as the eastern border of Skid Row:



*Skid Row Boundaries*

17. Skid Row is characterized by narrow streets and a variety of tightly packed commercial and residential buildings, to include apartments, hotels, buildings with single-room occupancy ("SRO")[3] units, and businesses. Skid Row also consists of buildings occupied by various organizations offering social services to the large homeless population that resides in the area. Much of the homeless population resides in tents and makeshift structures (also referred to as "encampments") that densely line the streets in front of the commercial and residential buildings in Skid Row.

18. Drug dealers from across the Los Angeles area travel to Skid Row to prey upon the homeless population and individuals that travel to Skid Row to purchase drugs.

19. Skid Row drug dealers consist of a mixture of members of criminal street gangs and independent operators. The tactics utilized by Skid Row drug dealers include, but are not limited to, dressing like members of the homeless population or social/city workers to blend into the environment and evade detection by law enforcement, utilizing tents and makeshift structures to obfuscate their illicit activities from public view, and stashing or storing a majority of their supply of drugs in nearby vehicles, tents, or makeshift structures or the environment, which limits their criminal liability should they encounter members of law enforcement. Drug dealers also utilize SRO units and other forms of low-income housing available in

[3] A single-room occupancy ("SRO") unit is a type of low-cost housing typically aimed at residents with low or minimal incomes.

the area to store or stash their drug supply. Skid Row drug dealers often use vehicles and residences not registered in their name to elude scrutiny by law enforcement.

20. Skid Row has a high density of foot traffic from the homeless population that resides in the area. As a result of the high degree of foot traffic, street-level drug dealers often hide in plain sight and conduct hand-to-hand narcotics transactions. Drug users will walk up to a street-level dealer, pay them $20 or $40, and receive a small user quantity of cocaine base, fentanyl, PCP, or methamphetamine.

21. Local law enforcement officers tasked with policing Skid Row often face challenges unique to Skid Row. Many of the drug dealers in Skid Row have operated there for many years and easily recognize plain clothes narcotics enforcement officers and their unmarked vehicles. The drug dealers quickly recognize changes in their environment and are suspicious of strangers amongst their usual clientele. Drug dealers also keep track of the work schedule of narcotics and gang enforcement officers, often employing tactics to avoid detection while those officers are working. Drug dealers in Skid Row are also knowledgeable about federal sentencing guidelines for narcotics sales and distribution and will conceal much of their larger drug supply in locations outside of Skid Row, often referred to as "stash pads." Drug dealers will make frequent trips throughout the day to "re-up" or replenish their on-hand supply of drugs from these stash pads. Only bringing small quantities of narcotics for sale or distribution at a time limits the drug dealers'

criminal liability should they encounter law enforcement during their drug sale activities. Drug dealers often employ "runners," individuals that retrieve drugs from the stash pad and deliver them to the Skid Row drug dealers when they are running low on their supply of drugs available for sale.

22. Drug dealers in Skid Row often occupy territory and protect or control their territory through various means, to include acts of violence. The territory held by drug dealers ranges in size from single street corners to entire city blocks. Through discussions with members of the LAPD Central Division Narcotics Enforcement Detail ("Central NED") – who possess extensive historical knowledge of drug dealers operating in Skid Row – and information gathered from the investigation to date, investigators have identified several geographical areas within Skid Row controlled by the **TARGETS** of the investigation. Listed below are several of the areas controlled by various **TARGETS:**



Gladys Park

a. Gladys Park, located at 808 E 6th St, Los Angeles, CA 90021, is a small public park operated by the City of Los Angeles located within Skid Row. It is not territory controlled by a specific criminal street gang or organized group of individuals. Rather, it serves as an open-air drug market, where individual drug dealers, seemingly operating independently, have established a foothold. VAUGHNS is a documented Raymond Avenue Crip gang member who regularly sells drugs inside the park.

b. Based on my discussions with Central NED Officer William Gatlin, for several years, the All for Crime (AFC) Bloods criminal street gang controlled the narcotics sales at the northwest corner of 6th Street and Gladys Avenue utilizing multiple tent-like structures in the area. This corner is located at the same intersection as Gladys Park. TAYLOR is a documented All for Crime Blood member who distributed narcotics at this location. TAYLOR would disguise himself as a transient,

wearing dirty clothes to appear disheveled and utilize a large brown tent-like structure to conceal his narcotics sales. TAYLOR also employed many of the local transients to act as lookouts for him and would pay them with small amounts of narcotics.

c. Based on my discussions with Central NED Officer Gatlin and the investigation to date, the intersection of 5th Street and Crocker Street is controlled by a group of individuals utilizing tents and makeshift structures to sell drugs. THOMAS, MCYINTYRE, and GRIMSLEY conduct drug sales from tents and/or makeshift structures located at the intersection. Central NED has received information that THOMAS is the main drug supplier for drug dealers operating at that intersection. RICHARDS and HENDERSON are also known to sell drugs from their respective vehicles at that intersection. Investigators believe that THOMAS, MCINTYRE, and GRIMSLEY work in concert to sell drugs, controlling the southwest and southeast corners of the intersection.




*MCINTYRE Makeshift Structure*

### B. Target 1: Manuel VAUGHNS

#### 1. July 30, 2026: Surveillance and Buy/Bust Operation Targeting VAUGHNS

23. On July 30, 2026, as further described below, FBI investigators and members of the Central NED established surveillance in the vicinity of Glady Park at 806 East 6th Street, Los Angeles, California, for the purpose of conducting a buy/bust operation using a confidential source ("CS-1")[4] to target Manuel VAUGHNS, a Raymond Street Crip gang member known by investigators to frequently sell drugs in Skid Row. CS-1 was instructed by investigators to specifically buy narcotics from VAUGHNS based on LAPD Central NED's prior arrests of VAUGHNS for street level drug sales, dating as far back as 2019, as well as Crime Stopper tips that the LAPD had received regarding VAUGHNS's drug sale activities. CS-1 utilized audio and visual recording equipment during the operation.

24. For approximately one-and-a-half hours leading up to the buy/bust operation, LAPD Central Division Officer Ceballos monitored a recorded security camera with views of Glady Park and the surrounding streets. Officer Ceballos observed VAUGHNS

[4] CS-1 was convicted and sentenced to probation in 1995 and 1997 for state charges of fraud. CS-1 was also convicted for driving under the influence in 2011. CS-1 has been working for the LAPD as an informant since June 7, 2022, and has conducted approximately 183 narcotic purchases for the LAPD. CS-1's information has led to the seizure of drugs, money, and firearms in the past. CS-1's information has been corroborated throughout the investigation and deemed to be credible and reliable. CS-1 has been working for monetary compensation and has been paid a total of $42,613, since June 7, 2022. CS-1 was recently signed up by the FBI and DEA as a confidential source and has reliably conducted several controlled narcotics purchases for monetary compensation.

arrive to the area and park **SUBJECT VEHICLE 1.**[5] After his arrival, VAUGHNS walked to and entered **SUBJECT VEHICLE 2**[6] for several minutes. After exiting **SUBJECT VEHICLE 2,** VAUGHNS entered Gladys Park and sat at a bench at the southeast corner of the park. For approximately the next hour-and-a-half, Officer Ceballos monitored the security camera as VAUGHNS conducted what appeared to be approximately six to eight hand-to-hand drug sales, returning to **SUBJECT VEHICLE 2** after approximately every three to four transactions.

25. Once Central NED established surveillance in the vicinity of Gladys Park, CS-1 was dropped off by FBI investigators near Gladys Park and walked toward the park.

26. Upon entering the park, CS-1 approached VAUGHNS, who was sitting at the bench at the southwest corner of the park. CS-1 engaged in a brief conversation with VAUGHNS and, following the conversation, VAUGHNS exited the park and walked

[5] As explained below, VAUGHNS is the registered owner of **SUBJECT VEHICLE 1.**

[6] **SUBJECT VEHICLE 2** is registered to Marcius L. Duboise or Cretasha ColbertDuboise, with a registered address of 1118 East Tucker Street, Compton, California 90221.

to **SUBJECT VEHICLE 2.** VAUGHNS entered **SUBJECT VEHICLE 2** briefly, exited, and returned to CS-1 in the park.







27. Upon returning to CS-1, VAUGHNS and CS-1 engaged in a short conversation before CS-1 provided VAUGHNS $60 in exchange for a clear plastic bindle containing approximately 4.5 gross grams of an off-white substance resembling cocaine base (FBI Case Number: LA-4254733, Evidence Item: 1B33).

28. DEA Southwest Laboratory's testing of Evidence Item 1B33 confirmed that it is a mixture containing cocaine base with a net weight of 2.02 grams.

29. Following the transaction, CS-1 met with FBI investigators and relinquished custody of the suspected cocaine base to the FBI.

30. Following the controlled drug purchase, LAPD Detective Trejo directed uniformed LAPD Gang Enforcement Detail ("GED") officers to enter Gladys Park and detain VAUGHNS.

31. LAPD GED officers detained VAUGHNS inside Gladys Park and took him into custody without incident. Officer Rosales seized VAUGHNS's cellular telephone (the "VAUGHNS Phone"),

which was in his hands at the time of his detention, and searched VAUGHNS incident to arrest, finding and seizing approximately $1,740 in cash from various pockets of his shorts.

32. Based on the observations made by Officer Ceballos while viewing the security camera, LAPD NED and GED officers conducted a protective sweep of **SUBJECT VEHICLE 2** and discovered no additional occupants. Officers subsequently searched **SUBJECT VEHICLE 2.** Inside of **SUBJECT VEHICLE 2,** amongst other items, Officer Gatlin seized a clear plastic bindle containing approximately 2.6 gross grams of an off-white substance resembling cocaine base (FBI Case Number: LA-4254733, Evidence Item: 1B35).

33. DEA Southwest Laboratory's testing of Evidence Item 1B35 confirmed that it is a mixture containing cocaine base with a net weight of 0.308 grams.

2. Search of the Digital Contents of the VAUGHNS Phone

34. Following the buy/bust operation targeting VAUGHNS, on August 6, 2026, LAPD Central NED Officer Gatlin obtained a search warrant authorized by the Honorable Michelle Ahnn, Judge of the Superior Court of Los Angeles County, to search the contents of the VAUGHNS Phone.

35. A search of the digital contents of the VAUGHNS Phone revealed that VAUGHNS utilizes the phone number ending in 9729 (the "9729 Number").

36. A search of the digital contents of the VAUGHNS Phone revealed a text message conversation between VAUGHNS and an individual utilizing a telephone number ending in -3434 (the "3434 Number"), programmed into VAUGHNS's cellular telephone as "Deandre 1."

a. The following is a text message conversation between VAUGHNS and Deandre 1 on July 20, 2026:

VAUGHNS: I'm Ready

Deandre 1: Ok imma get it together in morning

VAUGHNS: Cool 👍🏿

Deandre 1: Cool

VAUGHNS: Make it fire 🔥 🔥🔥
Less baking soda

Deandre 1: U know it

Deandre 1: How was last one

VAUGHNS: Good had few feedback

Deandre 1: Man U know they always complain man

VAUGHNS: Yea talking about they taste the soda

Deandre 1: Man they full of shit lol

VAUGHNS: Hey make sure it's hard tho

Deandre 1: Ok

VAUGHNS: Cool

b. Based on my training and experience, it is my belief that this text message conversation between VAUGHNS and Deandre 1 is a discussion about producing cocaine base from cocaine hydrochloride (HCL) (also referred to as powder cocaine). In my training and experience, I know that baking soda

is a common ingredient used to produce cocaine base. In the texts, VAUGHNS is asking Deandre 1 to use less baking soda in the production of the cocaine base because customers are complaining that they can taste the baking soda in the product. Further, VAUGHNS instructs Deandre 1 to ensure that the cocaine base is hard in texture.

c. The following is a text message conversation between VAUGHNS and Deandre 1 on July 21, 2026:

Deandre 1: Doing right now

Deandre 1: What time u going be ready

VAUGHNS: I'm on my way out there

Deandre 1: Ok

VAUGHNS: What time you be ready

Deandre 1: Hour cooking fire my boy

Deandre 1: (See Photo Below)



*Photo Sent to VAUGHNS by Deandre 1*

Deandre 1: Where u going too be

VAUGHNS: Los Robles

Deandre 1: Ok bagging up now

VAUGHNS: Cool

Deandre 1: 2 min

d. Based on my training and experience, it is my belief that in this conversation, Deandre 1 is informing VAUGHNS that he is currently producing the cocaine base. VAUGHNS inquires what time the cocaine base will be ready, and Deandre 1 responds that it will be ready in an hour. The photo sent to VAUGHNS by Deandre 1 shows the progress that he has made in producing the cocaine base. Deandre 1 later asks VAUGHNS where he is currently located and VAUGHNS responds "Los Robles." Deandre 1 informs VAUGHNS that he is packaging up the cocaine base and will be departing in two minutes.

e. The following is a text message conversation between VAUGHNS and Deandre 1 on July 22, 2026:

Deandre 1: U know anybody sell the blue pills down there

VAUGHNS: No I can check tho

Deandre 1: Check for I got 5k of them

VAUGHNS: Cool

f. Based on my training and experience, in this text conversation, Deandre 1 is asking VAUGHNS if he knows anyone in Skid Row that sells fentanyl pills, which are commonly produced to mimic blue pharmaceutical oxycodone pills stamped with "M'" on one side and "30" on the other. VAUGHNS responds that he does not know anyone selling fentanyl in Skid Row but can check. Deandre 1 responds that he is in possession of 5,000 pills. It is my belief that Deandre 1 is asking VAUGHNS if he knew of any

street-level dealers that would purchase his supply of blue "M30" fentanyl pills.

g. The search of the VAUGHNS Phone also revealed several text message conversations between VAUGHNS and Deandre 1 involving firearms. Specifically, the conversations revealed that Deandre 1 was assisting VAUGHNS in purchasing firearms from third parties. The following text message conversation took place between VAUGHNS and Deandre 1 on November 20, 2025:

Deandre 1: Buddy got a g19 he want 900

VAUGHNS: He won't take 8

Deandre 1: I'm trying

VAUGHNS: Yup

VAUGHNS: 850 Everything good with it

Deandre 1: It's his personal 1 he need the money that's why he selling then going to say he lost it

VAUGHNS: Oh ok I cee

VAUGHNS: Get a pic of it

Deandre 1: (See Photo Below)



*Photo sent from Deandre 1 to VAUGHS*

Deandre 1: (See Photo Below)



*Photo sent from Deandre 1 to VAUGHS*

VAUGHNS: Ok

Deandre 1: Yea that's new

VAUGHNS: Cool

Deandre 1: They ban that 19

VAUGHNS: They ban all the glocks cause of the switch

Deandre 1: Jesus

Deandre 1: Thats why everybody holding on too them lol

VAUGHNS: Yea r a higher ticket

Deandre 1: Yes

Deandre 1: He ain't trying too break prove

VAUGHNS: Nobody you know got got a switch

Deandre 1: I got 4 of them thangs man they dangerous

VAUGHNS: I need one

Deandre 1: Hahahaha

Deandre 1: Man once u pull man its going down

VAUGHNS: I always wanted one

Deandre 1: U should of been told me that men

VAUGHNS: Idk

Deandre 1: U know I keep my Ears to the streets man

VAUGHNS: Oh yea

Deandre 1: Hopefully someone come with a better deal it’s hard ball right now on them g19

VAUGHNS: I know

VAUGHNS: I’m thinking about getting it

Deandre 1: Man

Deandre 1: I chase it down for u

Deandre 1: U like Glocks I would of took that 40 s&w that’s a good heater too

VAUGHNS: Yea I’m more Glock first

Deandre 1: I feel u

VAUHNS: Yup

Deandre 1: I can get u 40 for 700 200 cheaper

Deandre 1: Damn near brand new

VAUGHNS: What kind of?

Deandre 1: S&w

Deandre 1: It’s a good heater on my momma

VAUGHNS: Oh yea

Deandre 1: U playing lol

VAUGHNS: Ok

Deandre 1: (See Photo Below)



*Photo sent from Deandre 1 to VAUGHS*

h. In this text message conversation, it is my belief based on my training and experience that Deandre 1 is informing VAUGHNS that he has a connection that has a "g19" for sale for $900. In my training and experience, I know that a "g19" is an abbreviation for a Glock 19, a semi-automatic pistol chambered in 9mm and manufactured by Glock Industries.

i. Deandre 1 further informs VAUGHNS that the owner of the Glock 19 is selling the pistol because he needs the money and will report it as lost to authorities following the sale.

j. VAUGHNS asks Deandre 1 to send him a photograph of the Glock, to which Deandre 1 responds by sending two photographs of the firearm.

k. In one of the two photographs sent by Deandre 1 to VAUGHNS of the Glock pistol for sale, the serial number of the firearm is clearly visible as CBDE574. A search of available law enforcement databases revealed that the Glock pistol bearing

serial number CBDE574 is registered to an individual utilizing an address in Pasadena, California.

l. VAUGHNS and Deandre 1 further discuss how Glocks are banned, presumably in the State of California, because they can be modified with a "switch." In my training and experience, a "switch" is a common term for a device that is attached to Glock pistols to convert them from functioning as a semi-automatic firearm to a fully automatic firearm. Deandre 1 adds that people are not readily selling their Glock pistols because of the ban.

m. VAUGHNS jokes that nobody actually owns a Glock pistol modified with a "switch," to which Deandre 1 responds that he owns four of them, and further adds that they are dangerous. VAUGHNS responds that he has always wanted a pistol with a "switch." Deandre 1 responds that VAUGHNS should have informed him that he wanted such a pistol, and he further informs VAUGHNS that he will be looking for such a pistol on the "street" on his behalf.

n. Deandre 1 informs VAUGHNS that, hopefully, they can find a Glock 19 at a better price. Deandre 1 points out that VAUGHNS likes Glocks, but he should have taken the "40 s&w", at $700, $200 cheaper than the Glock. In my training and experience, I believe that a "40 s&w" is describing a Smith and Wesson pistol chambered in .40 caliber. Deandre 1 describes the "40 s&w" as a "good heater." Based on my training and experience, I believe a "heater" is slang or a coded term used to describe a firearm.

o. Deandre 1 ends the day's conversation by sending VAUGHNS a picture of a Smith & Wesson pistol with what appears to be an obliterated serial number.

p. The following text message conversation took place between VAUGHNS and Deandre 1 on November 21, 2025:

VAUGHNS: When can you get the 9

Deandre 1: I just texts him

VAUGHNS: Ok

VAUGHNS: The one for 7

Deandre 1: That's a 40

Deandre 1: He want 9 for the Glock

VAUGHNS: Yea the 40 Mybad

Deandre 1: Silver and black is a 40

VAUGHNS: Yea the 40

Deandre 1: I got that with me now

VAUGHNS: Bring it

Deandre 1: Ok

Deandre 1: Give me a few

VAUGHNS: Ok

Deandre 1: 4 min

VAUGHNS: Cool

Deandre 1: That's a good heater

VAUGHNS: I hope so

Deandre 1: Clean good been shot once my boy

VAUGHNS: Ok Cool 👍🏿

Deandre 1: How u looking on jeezy

VAUGHNS: Still Popin I'm Moving Slow Police Tripping

Deandre 1: Hell yea got to be careful

VAUGHNS: Yes they been popin them all week

Deandre 1: Dirty dogs

VAUGHNS: Yea so I just take my time now

Deandre 1: Fuck yea

q. In this text message conversation between VAUGHNS and Deandre 1, it is my belief based on my training and experience that VAUGHNS is inquiring about the "9" or the 9mm Glock pistol discussed between the two individuals the day prior. Deandre 1 replies that he had just texted the owner of the firearm. VAUGHNS clarifies that he is inquiring about the pistol available for sale for $700, to which Deandre 1 replies that the $700 pistol was the pistol chambered in .40 caliber, referring to the same Smith & Wesson pistol discussed on November 20, 2025. VAUGHNS clarifies that he is referring to the Smith & Wesson chambered in .40 caliber, and informs Deandre 1 that he wishes to purchase it. Deandre 1 informs VAUGHNS that the pistol is currently in his possession. VAUGHNS instructs Deandre 1 to bring the pistol to him. Deandre 1 informs VAUGHNS that it is a good pistol and asks VAUGHNS to give him a "few," presumably minutes. Deandre 1 then provides VAUGHNS with an estimated time of arrival of four minutes.

r. The conversation finishes with Deandre 1 asking VAUGHNS, "How u looking on jeezy," which presumably is Deandre 1 asking how drug sales are going in Skid Row. VAUGHNS bemoans that the police have been active, so he has been moving slowly.

s. A search of VAUGHNS's criminal history reveals that he is a convicted felon and is prohibited from owning or being in possession of a firearm or ammunition. VAUGHNS's felony convictions include:

i. A 2006 conviction for illegal possession of ammunition in violation of California Penal Code Section 12316(b)(1).

3. Identification of Deandre 1 as James Deondrae STANFORD

37. A search of available law enforcement databases for the 3434 Number revealed that the telephone number was associated with a James Deondrae Stanford ("Stanford"). It is my opinion that Stanford is programmed into VAUGHN's cellular telephone as Deandre 1, which is a misspelling of Stanford's middle name: Deondrae.

38. A search of available law enforcement databases revealed that Stanford has numerous addresses associated to him, including:

a. 3112 Anasazi Way, Simi Valley, California, 93063, i.e., **SUBJECT PREMISES 1**; and

b. 1019 North Summit Avenue, Pasadena, California, 91103, i.e., **SUBJECT PREMISES 2**.

4. Identification of Addresses Associated with VAUGHNS

39. A search of available law enforcement databases revealed that VAUGHNS is associated with the following addresses:

a. 1829 E Workman Avenue, Apartment 22, West Covina, California, 91791, i.e., **SUBJECT PREMISES 3.**

b. 1122 North Los Robles Avenue, Pasadena, California, 91104 (the "Pasadena Residence").

40. A search of the California Department of Motor Vehicles ("DMV") database reveals that **SUBJECT VEHICLE 1** is registered to VAUGHNS, with a registration address matching that of **SUBJECT PREMISES 3.**

5. Spot Check of SUBJECT PREMISES 3 on August 12, 2026

41. On August 12, 2026, at approximately 3:30 p.m., Sergeant Richard Koval, assigned to the Los Angeles Metropolitan Violent Gang Task Force ("LAMVGTF"), conducted a spot check of **SUBJECT PREMISES 3** and observed **SUBJECT VEHICLE 1** parked at the residence.

6. GPS Cell-Site Search Warrant Obtained for the 3434 Number

42. On August 24, 2026, LAPD Central NED Officer Gatlin obtained a search warrant signed by the Honorable Peter J. Mirich, Judge of the Superior Court of Los Angeles County, authorizing the GPS cell-site location tracking of the 3434 Number from July 13, 2026 through September 23, 2026.

43. Analysis of GPS cell-site location data for the 3434 Number from August 24, 2026 to September 23, 2026 by FBI SA Richi George revealed that Stanford regularly spends evening and overnight hours at **SUBJECT PREMISES 1,** indicating that he resides at that address.

44. Analysis of GPS cell-site location data for the 3434 Number from August 24, 2026 to September 23, 2026 by SA George revealed that Stanford regularly makes trips to **SUBJECT PREMISES 2** during daytime hours.

7. GPS Cell-Site Search Warrant Obtained for VAUGHNS's Cellular Telephone on September 14, 2026

45. On August 12, 2026, LAPD Central NED Officer Gatlin obtained a search warrant signed by the Honorable Thomas Griego, Judge of the Superior Court of Los Angeles County, authorizing the GPS cell-site tracking of the 9729 Number, i.e., VAUGHNS's telephone number, from August 12, 2026 through September 12, 2026.

46. On September 14, 2026, LAPD Central NED Officer Gatlin obtained a renewed search warrant signed by the Honorable Maral Injejikian, Judge of the Superior Court of Los Angeles County, authorizing the GPS cell-site tracking of the 9729 Number from August 14, 2026 through October 14, 2026.

47. Analysis of the GPS cell-site data for that telephone from August 12, 2026 to September 23, 2026, revealed that the 9729 Number regularly pinged in the vicinity of **SUBJECT PREMISES 3** in the evening and overnight hours, indicating that VAUGHNS resides at that address.

48. Analysis of GPS cell-site location data for the 9729 Number revealed that VAUGHNS spends portions of daytime hours in Skid Row. Based on my training and experience, and the investigation to date, it is my belief that VAUGHNS spends time in Skid Row selling drugs.

49. Analysis of GPS cell-site location data for the 9729 Number revealed that VAUGHNS spends portions of his day in the vicinity of the Pasadena Residence. Notably, the Pasadena Residence is approximately 0.7 miles from **SUBJECT PREMISES 2,** i.e., where Stanford regularly spends time.

8. Surveillance of VAUGHNS on September 10, 2026, at the Pasadena Residence

50. On September 10, 2026, law enforcement conducted surveillance of VAUGHNS, starting at the Pasadena Residence. At approximately 11:05 a.m., law enforcement saw VAUGHNS washing **SUBJECT VEHICLE 3** at the Pasadena Residence.[7] VAUGHNS was also seen interacting with neighbors and entering the Pasadena Residence through a side entrance.

51. At approximately 1:00 p.m., VAUGHNS was seen departing the Pasadena Residence in **SUBJECT VEHICLE 3** and returning a short time later.

52. The GPS cell-site data on the 9729 Number matched VAUGHNS's location at the time that the surveillance team observed him in front of the Pasadena Residence, indicating that he had the cellular telephone on his person or nearby.

9. September 22, 2026: Surveillance of Stanford at SUBJECT LOCATION 2

53. On September 22, 2026, members of Santa Monica Police Department ("SMPD") conducted surveillance of Stanford at **SUBJECT PREMISES 2.** At approximately 6:20 a.m., law enforcement established surveillance at **SUBJECT PREMISES 2.**

[7] VAUGHNS is the registered owner of **SUBJECT VEHICLE 3,** with a registered address of **SUBJECT PREMISES 3.**

54. At approximately 10:16 am, SMPD Detective Hernandez observed a white Nissan Altima bearing California license plate 8RUN071 arrive at **SUBJECT PREMISES 2.** The driver was an unknown black male in his late 20s ("UMB-1"). UMB-1 repeatedly drove in circles around the street on which **SUBJECT PREMISES 2** was located. Based on Detective Hernandez's training and experience, the unknown black male appeared to be serving as a lookout for **SUBJECT PREMISES 2.**

55. Through the course of the morning, multiple black males were seen by law enforcement arriving at the location and hanging out in front of **SUBJECT PREMISES 2.** At approximately 12:28 pm, Stanford arrived at **SUBJECT PREMISES 2** driving **SUBJECT VEHICLE 16.**[8]

56. Stanford exited the vehicle and walked into **SUBJECT PREMISES 2.** Stanford then exited **SUBJECT PREMISES 2** and returned to **SUBJECT VEHICLE 16,** grabbed a blue HoKa shoebox from the vehicle, and put the shoebox into a larger cardboard box. Stanford then gave the cardboard box to the driver of a Chevrolet sedan bearing California license plate 8AEV546l. The driver of the Chevrolet put the box into the trunk of his vehicle. Stanford continued hanging out in front of **SUBJECT PREMISES 2.**

57. Based on my training and experience, I believe that the activities that occurred around **SUBJECT PREMISES 2** are

[8] Stanford is the registered owner of **SUBJECT VEHICLE 16,** with a registered address of **SUBJECT PREMISES 2.**

indicative of **SUBJECT PREMISES 2** being utilized as a narcotics stash location.

10. Identification of **SUBJECT PREMISES 5** – An SRO Utilized by VAUGHNS

58. Based upon cellular telephone GPS cell-site location data for VAUGHNS and observations of VAUGHNS in the area, on September 9, 2026, Central NED Detective Jorge Trejo requested that LAPD Senior Lead Officer ("SLO")[9] Deon Joseph contact management of 625 South San Pedro Street, Los Angeles, California, 90014 to inquire if VAUGHNS was maintaining a room in the building. Building management confirmed with Officer Joseph that VAUGHNS was the registered occupant of 625 South San Pedro Street, Apartment 418, Los Angeles, California, 90014, i.e., **SUBJECT PREMISES 5**.

59. 625 South San Pedro Street is a building comprised of multiple SRO units. From discussions with members of Central NED, I know that drug dealers in the Skid Row area often utilize available social services to maintain units in Skid Row SROs to utilize as drug stash locations. As discussed above, cellular telephone cell-site location data reveals that VAUGHNS resides at **SUBJECT PREMISES 3**, and not **SUBJECT PREMISES 5**, making it probable that **SUBJECT PREMISES 5** is utilized in the furtherance of VAUGHNS's drug dealing activities.

60. On October 5, 2026, Housing and Urban Development ("HUD") Office of the Inspector General ("OIG") SA Cale Winslow

---

[9] An LAPD Senior Lead Officer is tasked with community relations and often has contacts with management at large residential buildings and businesses.

researched **SUBJECT PREMISES 5** and learned that this property maintains Permanent Supportive Housing ("PSH")[10] style housing for its tenants. However, it has not been verified whether or not VAUGHNS's unit at **SUBJECT PREMISES 5** falls into this category.

### C. Target 2: Shaquanda MASON

#### 1. July 30, 2026: Surveillance and Buy/Walk Operation Targeting MASON

61. On July 30, 2026, as further described below, Los Angeles HIDTA investigators, members of the LAPD Central NED and uniformed members of LAPD Central GED established surveillance in the vicinity of the intersection of 5th Street and Crocker Street, Los Angeles, California, for the purpose of conducting a buy/walk operation using CS-1 to target individuals willing to sell drugs. CS-1 utilized audio and visual recording equipment during the operation.

62. CS-1 was dropped off by investigators at the intersection of 4th Street and South Crocker Street with instructions to walk to the area near Odyssey Air Duct Enterprises, located at 508 1/2 South Crocker Street, Los Angeles, CA 90013, and purchase drugs from anyone willing to sell them.

63. Investigators observed CS-1 engaging in conversation with a group of unidentified males and females, then

[10] Permanent Supportive Housing Description: Permanent Supportive Housing (PSH) is permanent housing in which housing assistance (e.g., long-term leasing or rental assistance) and supportive services are provided to assist households with at least one member (adult or child) with a disability in achieving housing stability.

approaching **SUBJECT VEHICLE 4**[11] parked adjacent to an encampment, i.e., **SUBJECT PREMISES 6**, located on Crocker Street on the southeast corner of the intersection of 5th Street and Crocker Street.

64. In discussions with Detective Trejo and other LAPD Central NED investigators, I have learned that **SUBJECT PREMISES 6** has historically been operated for years by Charles MCINTYRE, who is the patriarch of a family-run front for selling narcotics under the guise of selling water and snacks. Central NED investigators know that **SUBJECT VEHICLE 4** is utilized by MCINTYRE through numerous law enforcement interactions at the location.

65. A review of the surreptitious audio and video recording equipment worn by CS-1 revealed that when CS-1 approached the RV, the screen door was closed. CS-1 spoke with an unidentified male subject ("UM-1"), suspected by investigators to be MCINTYRE, through the screen door and inquired about purchasing drugs. UM-1 directed CS-1 to **SUBJECT PREMISES 6** to conduct the purchase with UM-1's "girlfriend."

66. CS-1 walked to **SUBJECT PREMISES 6** and approached MASON, who was seated inside. CS-1 spoke briefly with MASON, then provided MASON with $60 in exchange for a clear plastic bag containing an off-white rock-like substance resembling

---

[11] A search of the California DMV database reveals that **SUBJECT VEHICLE 4** is registered to Mayha Lakaysha McIntyre with a registered address of 4600 Coliseum Street, Apartment 102, Los Angeles, California, 90016.

cocaine base, weighing approximately 33 gross grams (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 1).




*Photo of MASON Captured on CS-1's Body Worn Camera*

67. Following the transaction, CS-1 met with FBI investigators and relinquished custody of the suspected cocaine base to them.

68. DEA Southwest Laboratory testing of Exhibit 1 verified that it was a mixture containing cocaine base with a net weight of 2.18 grams.

69. Based on my training and experience, and through discussions with members of LAPD Central NED, I believe that **SUBJECT PREMISES 6** is not utilized as a domicile. Further, a review of CS-1's body worn camera footage did not show evidence that **SUBJECT PREMISES 6** was being utilized as a domicile, but instead as a location to store and distribute drugs.

70. Investigators maintained surveillance on MASON for approximately one hour following the controlled narcotics purchase, at which time LAPD Central NED Detective Trejo

directed uniformed LAPD Officers Suttle and Enriquez to detain MASON and positively identify her.

### D. Targets 3 and 4: Charles MCINTYRE and Creshana MOSLEY

#### 1. April 23, 2026: Buy/Bust of Charles MCINTYRE and Creshana MOSLEY

71. On April 23, 2026, LAPD Central NED utilized a confidential source ("CS-2")[12] to conduct a controlled purchase of drugs from **SUBJECT PREMISES 6.**

72. CS-2 was dropped off by investigators near **SUBJECT PREMISES 6.** CS-2 then walked to **SUBJECT PREMISES 6,** which was occupied by an individual wearing a red shirt and an orange skirt, later identified as MOSLEY, who was selling cigarettes. CS-2 asked MOSLEY if she knew "someone that had something," which from my training and experience I know is street vernacular for inquiring about purchasing narcotics.

73. MOSLEY asked what CS-2 wanted, and CS-2 responded "120" and handed MOSLEY a $100 bill and $20 bill. MOSLEY, said "hold on, let me go get it," and looked around the table as if looking for a baggie to put the narcotics in. MOSLEY then walked to passenger side window of **SUBJECT VEHICLE 5,**[13] which was parked nearby on Crocker Street. LAPD Central NED Officer

[12] CS-2 is currently in good standing with the DEA and has proven to be reliable and has been corroborated to the extent possible, including as discussed in this affidavit. CS-2 is a paid confidential source and is not facing any criminal charges. CS-2 was established as a DEA confidential source in 2019. CS-2's criminal history includes prior convictions for felony armed robbery in 1990, conspiracy to sell cocaine in 1992, and felony robbery in 1996.

[13] **SUBJECT VEHICLE 5** is registered to A.J.R. with a registered address of 700 Camulos Street, Los Angeles, California, 90023.

Brian Kolke observed MOSLEY leaning against **SUBJECT VEHICLE 5**'s front passenger door. MOSLEY returned to CS-2 in **SUBJECT PREMISES 6** and handed CS-2 one individual off-white substance resembling cocaine base (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 27).

74. Following the transaction, CS-2 met with LAPD Central NED investigators and relinquished custody of the suspected cocaine base.

75. LAPD Forensic Science Division testing of Exhibit 27 verified that it was a mixture containing cocaine base with a net weight of 2.89 grams.

76. Following the controlled purchase, Officer Castro directed uniformed officers to **SUBJECT PREMISES 6** and **SUBJECT VEHICLE 5** to detain the occupants. MOSLEY was detained at **SUBJECT PREMISES 6.** Officers approached **SUBJECT VEHICLE 5** and observed MCINTYRE seated in the front passenger seat and an individual, later identified as C.Y., laying down in the rear of **SUBJECT VEHICLE 5** with a small child, later identified as S.M.

77. A search of **SUBJECT VEHICLE 5** resulted in the seizure of various currency, including the bills provided to MOSLEY by CS-2, which were located in a compartment below the radio, as well as of **SUBJECT DEVICES 1, 2, 3,** and **4.** A search of **SUBJECT VEHICLE 5** also resulted in the seizure of additional controlled substances located throughout the vehicle to include, but not limited to:

a. A plastic tray with off-white solids resembling cocaine base (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 28).

b. One off-white solid from the blanket where C.Y. and the young child were lying down (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 29).

c. Four clear plastic bindles containing crystalline solids resembling methamphetamine from a tissue box in the rear driver's side seat (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 30).

d. Multiple oval pills resembling unknown narcotics (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 31).

78. DEA Southwest Laboratory testing of Exhibits 28 and 29 are still pending completion. DEA Southwest Laboratory testing of Exhibit 30 verified that it contained 108.8 grams of pure methamphetamine.

79. The results of DEA Southwest Laboratory testing of Exhibit 31 revealed that there were two separate items packaged together. The items were tested separately as Exhibit 31.01 and Exhibit 31.02. Testing of Exhibit 31.01 revealed that oval pills were Acetaminophen. Testing of Exhibit 31.02 revealed that it was cocaine base residue.

2. <u>June 2, 2026: MCINTYRE Utilizes SUBJECT VEHICLE 4</u>

80. According to information provided by LAPD Central NED Officer Gatlin, on June 2, 2026, at approximately 8:40 a.m., two citizens flagged down uniformed LAPD Resources Enhancement

Services and Enforcement Team ("RESET")[14] officers attempting to report a catalytic converter theft on **SUBJECT VEHICLE 4.** The citizens advised officers that **SUBJECT VEHICLE 4** was left in their care but belongs to MCINTYRE and is registered to his daughter. The citizens were advised to have MCINTYRE report the catalytic converter theft online due to the registered owner not being present.

81. Based on my training and experience, I believe that although SUBJECT VEHICLE 4 is registered to MCINTYRE's daughter, MCINTYRE utilizes SUBJECT VEHICLE 4 to further his drug sales activities at the intersection of 5th Street and Crocker Street.

3. August 5, 2026: Buy/Walk of Approximately 32.1 Grams of Suspected Cocaine Base from MCINTYRE

82. On August 5, 2026, members of HIDTA Group 44 and 51 conducted a buy/walk operation involving MCINTYRE at **SUBJECT PREMISES 6.**

83. Once surveillance units were in position, CS-2 was dropped off by investigators in the vicinity of the intersection of 5th Street and Crocker Street wearing a covert audio and video recording device.

---

[14] The LAPD Central Division RESET unit is responsible for homeless outreach and crime suppression specifically in the Skid Row area of Downtown Los Angeles.

84. A review of the covert audio/video recording revealed that CS-2 proceeded to **SUBJECT PREMISES 6** and approached MCINTYRE, who was seated inside of **SUBJECT PREMISES 6.** CS-2 engaged in a brief conversation with MCINTYRE, leaning in close and informing him that CS-2 had $60. MCINTYRE is observed on the video reaching down and manipulating a grey fanny pack that he is wearing. The exchange between CS-2 and MCINTYRE for the purchase of narcotics occurs slightly out of view of the recording equipment. Following the transaction, MCINTYRE instructs an unidentified female ("UF-1") seated near him to provide CS-2 with $10 in change. CS-2 asks UF-1 for four cigarettes, then asks for two cigarettes before returning to meet with investigators.



*Screenshot of CS-2's body-worn recording equipment capturing MCINTYRE manipulating grey fanny pack*



*Screenshot of CS-2's body worn recording equipment capturing MCINTYRE conducting narcotics transaction with CS-2*

85. Upon returning to investigators, CS-2 relinquished custody of the suspected cocaine base, which consisted of approximately 32.1 gross grams of suspected crack cocaine (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 3) to them, along with $10 in change received from UF-1. During the

debriefing, CS-2 informed investigators that CS-2 handed MCINTYRE $60 and UF-1 provided CS-2 with $10 in change.

86. The results of DEA Southwest Laboratory testing of Exhibit 3, purchased from MCINTYRE, is still pending completion.

### E. Target 5: Rodney THOMAS, aka "JAMAICA"

#### 1. March 19, 2026: Arrest of THOMAS and Execution of Search Warrant at 1200 South Figueroa Street, Unit W914, Los Angeles, California, 90015

87. On March 19, 2026, LAPD Central NED with members of HIDTA Groups 44 and 51 and uniformed LAPD officers executed a search warrant signed by the Honorable Stephen A. Marcus, Judge of the Superior Court of Los Angeles County at the residence of THOMAS located at 1200 South Figueroa Street, Unit W914, Los Angeles, California, 90015, i.e., **SUBJECT PREMISES 7.**

88. Prior to executing the warrant, LAPD Central NED and HIDTA Group 44 and 51 established surveillance at **SUBJECT PREMISES 7.** At approximately 8:30 a.m., LAPD Central NED Officer Erik Haskell observed THOMAS departing the garage of **SUBJECT PREMISES 7** in **SUBJECT VEHICLE 6.**[15]

89. Approximately 15 minutes later, LAPD Central NED Detective Trejo observed THOMAS arrive in the vicinity of the intersection of 5th Street and Crocker Street in Skid Row. After making multiple U-turns, THOMAS parked **SUBJECT VEHICLE 6** on the west side of Crocker Street between 5th Street and 6th Street.

[15] The registered owner of **SUBJECT VEHICLE 6** is THOMAS's spouse, T.N., with a registered address 404 Palm Court, Compton, California, 90220.

90. THOMAS got out of **SUBJECT VEHICLE 6** and began walking northbound on the west sidewalk of Crocker Street. At that time LAPD Central NED Detective Trejo directed uniformed officers to detain THOMAS.

91. As the uniformed officers approached THOMAS, he ducked behind a vehicle and then stood back up. Shortly thereafter, uniformed LAPD officers detained THOMAS. Uniformed LAPD Officer Torres inspected the area near where THOMAS had ducked behind the vehicle and observed two black plastic bags that were tied closed. Officer Torres secured the items and handed the items to LAPD Central NED Officer Brian Kolke. Officer Kolke opened the plastic bags and discovered a black and red pouch containing approximately 467.3 gross grams of off-white solids resembling cocaine base contained in two plastic bags, and an orange digital scale with white residue resembling cocaine.

92. LAPD Forensic Science Division testing of one of the two plastic bags containing an off-white substance resembling cocaine base verified that the substance was a mixture containing cocaine base with a net weight of 242.1 grams. The testing further confirmed that the net weight of the off-white substances resembling cocaine base in both plastic bags totaled 464.05 grams.

93. At approximately 9:00 a.m., LAPD Central NED with assistance from HIDTA Groups 44 and 51, executed the search warrant at **SUBJECT PREMISES 7**.

94. At the time of execution, **SUBJECT PREMISES 7** was occupied by D.T., who identified himself as THOMAS's brother.

D.T. advised officers that he had just arrived from Jacksonville, Florida the previous night.

95. The search of **SUBJECT PREMISES 7** led to the seizure of, among other items, a clear plastic bag containing approximately 501.01 gross grams of a white powdery substance resembling cocaine, and a clear plastic bag containing approximately 256.22 gross grams of an off-white solid resembling cocaine base.

96. LAPD Forensic Science Division testing of the white powdery substance resembling cocaine verified that the substance was a mixture containing cocaine with a net weight of 500.08 grams. The clear plastic bag containing an off-white solid resembling cocaine base has yet to be tested.

97. The search of **SUBJECT PREMISES 7** also resulted in the seizure of four firearms and ammunition. A firearm lacking a serial number, commonly referred to as a "ghost gun," was also seized during the search. In addition to the ghost gun, law enforcement seized the following:

a. 11 rounds of Winchester 9mm Luger caliber ammunition;

b. A Bersa S.A. Ramos Mejia, model Firestorm, .380 ACP caliber semi-automatic pistol, bearing serial number K17549;

c. A Glock, model 34, 9mm caliber semi-automatic pistol, bearing serial number CACC447;

d. A Ruger, model EC9s, 9mm caliber semi-automatic pistol, bearing serial number 59-60221; and

e. A Taurus, model 709 Slim, 9mm caliber semi-automatic pistol, bearing serial number TIW00008.

98. During the search of **SUBJECT PREMISES 7**, law enforcement also found at least $81,000 in U.S. currency and a large amount of jewelry.

99. A search of THOMAS's criminal history reveals that he is a convicted felon and is prohibited from owning or being in possession of a firearm or ammunition. THOMAS's felony convictions include:

a. A 1999 conviction for possession of controlled substances for sale in violation of California Health and Safety Code Section 11351.5, for which he was sentenced to four years in state prison; and

b. A 2006 conviction for possession of controlled substances for sale in violation of California Health and Safety Code Section 11351.5, for which he was sentenced to three years in state prison.

100. At the conclusion of the search, Officer Gatlin returned to LAPD Central Station to interview THOMAS. As soon as Officer Gatlin opened the holding cell door, THOMAS stated that everything was his, and that his brother and wife had nothing to do with it.

101. In the course of the execution of the search warrant on THOMAS and **SUBJECT PREMISES 7**, Central NED seized **SUBJECT DEVICES 5** and **6**.

2. <u>August 5, 2026: Buy/Walk from THOMAS's Tent</u>

102. On August 5, 2026, members of HIDTA Groups 44 and 51 conducted a buy/walk operation involving THOMAS at the intersection of 5th Street and Crocker Street in Skid Row utilizing CS-2. CS-2 utilized audio and visual recording equipment during the operation.

103. At approximately 12:00 p.m., investigators established surveillance at the intersection of 5th Street and Crocker Street. At approximately 1:15 p.m., Task Force Officer ("TFO") Marco Oropeza observed THOMAS arrive in the area driving **SUBJECT VEHICLE 6.** THOMAS parked the vehicle on Crocker Street, south of 5th Street and proceeded to a blue and grey encampment located on the west sidewalk on Crocker Street south of 5th Street, i.e., **SUBJECT PREMISES 8.**

104. Investigators instructed CS-2 to locate **SUBJECT PREMISES 8** and buy drugs from THOMAS. Investigators dropped CS-2 off in the vicinity of **SUBJECT PREMISES 8** and observed CS-2 proceed to approach and enter the structure.

105. Inside **SUBJECT PREMISES 8,** as captured on audio and video recording, CS-2 made contact with THOMAS. CS-2 provided THOMAS with $60 in exchange for approximately 33 gross grams of an off-white solid resembling cocaine base (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 4).

106. The results of DEA Southwest Laboratory testing of Exhibit 4, purchased from THOMAS, are still pending completion.

107. A review of CS-2's body-worn audio and video footage reveals that CS-2 approached the tent, asked for "Jamaica," and was invited into **SUBJECT PREMISES 8.** THOMAS was seated at a table when CS-2 approached him and requested $60 worth of drugs.

108. CS-2 waited as THOMAS prepared the drugs for sale. Visible on the table at which THOMAS was sitting is a large chunk of an off-white substance resembling cocaine base.



*Screenshot of CS-2 Body Worn Footage*



*Screenshot of CS-2 Body Worn Footage*

109. Following the controlled purchase, CS-2 returned to investigators and relinquished custody of the evidence to them.

3. <u>August 11, 2026: Surveillance of THOMAS and Identification of THOMAS's SRO</u>

110. On August 11, 2026, members of HIDTA Groups 44 and 55 conducted a surveillance of THOMAS in Skid Row. At approximately 2:28 p.m., TFO Olga Alvarado observed THOMAS utilizing a key card to enter 625 South San Pedro Street, Los Angeles, California, 90014.

111. Based upon TFO Alvarado's observations, on September 9, 2026, Central NED Detective Jorge Trejo requested

that LAPD SLO Deon Joseph contact management at 625 South San Pedro Street, Los Angeles, California, 90014 to inquire if THOMAS was maintaining a room in the building. Building management confirmed with Officer Joseph that THOMAS was the registered occupant of 625 South San Pedro Street, Apartment 425, Los Angeles, California, 90014, i.e., **SUBJECT PREMISES 9.**

112. Based on my training and experience, it is my belief that THOMAS is utilizing **SUBJECT PREMISES 9** in furtherance of drug dealing activities in Skid Row. Maintaining a low-cost residence in Skid Row allows him to store his narcotics at a location where he does not actually reside, limiting his criminal liability. Further, storing his supply of narcotics within Skid Row limits the risk of driving greater distances with the narcotics stored in his vehicle.

113. THOMAS's SRO is in the same building as VAUGHNS's SRO. As previously mentioned when describing VAUGHNS's SRO, based on research conducted by HUD OIG SA Winslow, the building in which **SUBJECT PREMISES 9** is located maintains PSH-style housing for its tenants. However, it is not confirmed whether or not THOMAS's unit at **SUBJECT PREMISES 9** falls into this category.

114. A search of the California DMV database reveals that the address that THOMAS has on file with the DMV is **SUBJECT PREMISES 9.**

4. August 13, 2026: Surveillance of THOMAS at the Intersection of 5th Street and Crocker Street

115. On August 13, 2026, members of HIDTA Groups 44 and 51 conducted surveillance of THOMAS beginning at **SUBJECT PREMISES 7**. At approximately 11:24 a.m., THOMAS was seen by law enforcement departing **SUBJECT PREMISES 7** in a Ford Bronco bearing Arizona license plate "EXKUZME."[16] At approximately 11:37 a.m., TFO Antonio Rodriguez observed THOMAS arrive in the area of the intersection of 5th Street and Crocker Street.

116. Shortly after THOMAS parked the Ford Bronco, TFO Rodriguez observed THOMAS reach into the center console of the vehicle and pull out a weighted white sock. THOMAS was then observed walking to **SUBJECT PREMISES 8** and entering the structure.

117. Shortly after THOMAS's arrival at **SUBJECT PREMISES 8**, investigators observed multiple people entering the tent and exiting shortly after, which, based on my training and experience and the state of the investigation, is indicative of drug sale activity.

118. At approximately 2:12 p.m., investigators observed THOMAS exiting **SUBJECT PREMISES 8** with a bag in his hands and enter the Ford Bronco with an unidentified female ("UF-2"). Investigators followed THOMAS and, at approximately 2:32 p.m., observed THOMAS arrive in the vicinity of **SUBJECT**

[16] A check of the Arizona Department of Motor Vehicles database revealed that the Ford Bronco bearing Arizona license plate "EXKUZME" is registered to O.L.M.P., with a registered address of 1221 McCulloch Blvd S, Lake Havasu City, Arizona 86406.

**PREMISES 9**, park in a restricted parking zone, and enter the building with UF-2.

119. Based on observations made by investigators, it is my belief that the bag that THOMAS carried out of **SUBJECT PREMISES 8** contained the fruits of his drug sales for the day, and that THOMAS was travelling to **SUBJECT PREMISES 9** to store the fruits of his drug sale activity.

5. Administrative Subpoena Served to Apartment Management at SUBJECT PREMISES 7

120. On September 9, 2026, DEA SA Eric Maston served an administrative subpoena to apartment management at **SUBJECT PREMISES 7.**

121. The subpoena return verified that the apartment was still rented to THOMAS under his spouse T.N.'s name.

6. Identification of Vehicles Associated with THOMAS

122. While conducting the investigation of THOMAS leading to the search warrant executed by LAPD Central NED on March 19, 2026, investigators discovered that THOMAS owned multiple high-end vehicles, which were registered either in his spouse's name or in the name of a possible family member of Charles MCINTYRE, C.M.

123. From September 14, 2026 to September 16, 2026, DEA SA Maston conducted a site survey of **SUBJECT PREMISES 7** to locate the vehicles registered to THOMAS's spouse or C.M. The following vehicles were observed at **SUBJECT PREMISES 7:**

a. **SUBJECT VEHICLE 6**

b. **SUBJECT VEHICLE 7;**[17]

c. **SUBJECT VEHICLE 8;**[18]

d. A white 2018 Cadillac bearing California license plate 8VNL687;[19] and

e. A silver 2017 Cadillac bearing California license plate 9FIJ126.[20]

124. Based on my training and experience, and through conversations with fellow investigators, it is my belief that THOMAS purchased several of these vehicles with the fruits of his drug sale activities in Skid Row. In doing so, THOMAS launders his drug proceeds and conceals the source of the funds by having the vehicles registered in his spouse's name or C.M.'s name. I believe that THOMAS uses numerous vehicles in support of his drug sale activities and that a search of these vehicles could potentially yield further evidence of his crimes.

125. According to Internal Revenue Criminal Investigations ("IRS-CI") SA Anthony Chan, in the state of California, employers are required to file quarterly returns and reports to the State of California's Employment Development

[17] The registered owner of **SUBJECT VEHICLE 7** is T.N., with address 404 Palm Court, Compton, California, 90220.

[18] The registered owner of **SUBJECT VEHICLE 8** is T.N., with address 404 Palm Court, Compton, California, 90220.

[19] The registered owner of this vehicle is T.N., with address 404 Palm Court, Compton, California, 90220.

[20] The registered owner of this vehicle is C.M., with address 4165 Whittier Boulevard, Apartment 13, Los Angeles, California, 90023.

Department ("CA EDD"). These reports include employee wage reports for wages earned by an employee during the quarter.

126. Between the first quarter of 2020 through the second quarter of 2026, CA EDD has no records of wages being reported by any employer for THOMAS.

127. Based on the CA EDD records showing that THOMAS has no wage history from the first quarter of 2020 through the second quarter of 2026, I believe that THOMAS does not earn legally-sourced income. I believe that the cash and jewelry located and seized at THOMAS' apartment, as well as the luxury vehicles belonging to THOMAS, were purchased using illicit proceeds derived from his sales and distribution of narcotics.

7. September 28, 2026: Identification of SUBJECT PREMISES 12

128. On May 20, 2026, LAPD Central NED Officer Gatlin authored a search warrant signed by the Honorable Peter J. Mirich, Judge for the Superior Court of Los Angeles County, authorizing the GPS cell-site location tracking for the telephone number ending in -5381 (the "5381 Number"), a number known to be utilized by THOMAS.

129. The GPS cell-site location tracking for the 5381 Number has been utilized to aid in the continuing investigation of THOMAS and was repeatedly renewed upon expiration by Officer Gatlin, with limited gaps in receiving cell-site location for the 5381 Number during renewal periods.

130. Through the period that the GPS cell-site location tracking has been authorized, the investigation has

shown that THOMAS is continuing to utilize the 5381 Number. The 5381 Number has consistently been in the vicinity where THOMAS has been observed by investigators, to include various locations in Skid Row.

131. On September 2, 2026, Officer Gatlin renewed the GPS cell-site location tracking for the 5381 Number, signed by the Honorable Teresa Sullivan, Judge for the Superior Court of Los Angeles County.

132. From approximately September 14, 2026 to September 28, 2026, DEA SA Eric Maston observed that THOMAS's cellular telephone cell-site location data indicated that THOMAS was spending overnight hours in the vicinity of 346 Hauser Boulevard, Apartment 2-411, Los Angeles, California 90036, i.e., **SUBJECT PREMISES 12.** A review of the cellular telephone cell-site location data during that time period revealed that THOMAS would consistently spend the overnight hours in the area of **SUBJECT PREMISES 12** and the daytime hours in Skid Row.

133. In the early morning hours of September 28, 2026, DEA SA Maston conducted a spot check of **SUBJECT PREMISES 12** and observed **SUBJECT VEHICLE 7** parked in a staff parking spot for the apartment building.

134. Following the spot check of **SUBJECT PREMISES 12,** SA Maston conducted a spot check of **SUBJECT PREMISES 7** and observed **SUBJECT VEHICLE 8** still parked there.

135. On September 28, 2026, DEA SAs Byll Gentile and Derek Cisneros served an administrative subpoena to building

management at **SUBJECT PREMISES 12** to ascertain if THOMAS or his spouse was renting an apartment in the building. Apartment management informed DEA SA Gentile that neither individual was renting a unit in the building.

136. Management, in view of DEA SAs Gentile and Cisneros, reviewed apartment security video footage. In the reviewed footage, SAs Gentile and Cisneros observed THOMAS arriving in the staff parking spot with a female passenger, which apartment management confirmed was J.S., a tenant in the building staying in Apartment 2-411, which is a penthouse unit. According to building management, Apartment 2-411 only had one assigned parking spot, where J.S. typically parks.

137. Based on my training and experience, I believe that THOMAS is currently residing at **SUBJECT PREMISES 12,** as evidenced by the cellular telephone cell-site location data over the two week period from September 14, 2026 to September 28, 2026. It is also my belief that THOMAS continues to maintain access to **SUBJECT PREMISES 7,** as evidenced by **SUBJECT VEHICLE 8** being parked there.

8. <u>September 30, 2026: Surveillance of THOMAS</u>

138. On September 30, 2026, at approximately 5:51 p.m., members of HIDTA Groups 44 and 51 conducted surveillance of THOMAS. Investigators initiated surveillance at **SUBJECT PREMISES 9** based on GPS telephone cell-site location data for the 5381 Number. Investigators observed **SUBJECT VEHICLE 7** parked nearby.

139. At approximately 6:11 p.m., investigators observed THOMAS exit **SUBJECT PREMISES 9** and drive **SUBJECT VEHICLE 7** to the intersection of 5th Street and Crocker Street.

140. Previously, investigators installed a pole camera at the intersection of 5th Street and Crocker Street. The live footage from this pole camera aided investigators during this surveillance operation. Observations made by investigators were a combination of the live monitoring of the pole camera and direct observations made by investigators.

141. Once at the intersection, THOMAS repositioned **SUBJECT VEHICLE 7**, exited the vehicle with an object in his hands and walked to **SUBJECT PREMISES 8**.

142. At approximately 6:31 p.m., THOMAS walked across the street to **SUBJECT PREMISES 6**. He remained at **SUBJECT PREMISES 6** for approximately 30 minutes, after which he returned to **SUBJECT PREMISES 8** and went inside.

143. At approximately 7:09 p.m., an unknown male ("UM-2") carrying a backpack walked to **SUBJECT VEHICLE 7**, opened the door, and possibly appeared to place something inside the vehicle. UM-2 then met with THOMAS and the two walked into **SUBJECT PREMISES 8**. Approximately a minute later, THOMAS exited **SUBJECT PREMISES 8** and walked into **SUBJECT PREMISES 6**.

144. At approximately 7:14 p.m., THOMAS walked to **SUBJECT VEHICLE 7** and appeared to be looking at the item that UM-2 left in the vehicle. THOMAS then entered **SUBJECT VEHICLE 7** and drove to **SUBJECT PREMISES 9**. At approximately 7:20 p.m., THOMAS exited **SUBJECT VEHICLE 7** and walked into **SUBJECT**

**PREMISES 9** with what appeared to be a white bag tucked to his chest. THOMAS exited **SUBJECT PREMISES 9** at approximately 8:43 p.m. and drove **SUBJECT VEHICLE 7** to **SUBJECT PREMISES 12,** parking in a guest parking spot. THOMAS was observed meeting with a black female and the two entered the elevator together.

145. Based on my training and experience, I believe that THOMAS is continuing to conduct narcotics sales at the intersection of 5th Street and Crocker Street and that evidence of THOMAS's narcotics violations will be found at **SUBJECT PREMISES 8, 9,** and **12.**

9. Analysis of LAPD License Plate Reader Data and the 5381 Number

146. On October 6, 2026, LAPD Central NED Officer Gatlin conducted a search of the LAPD license plate reader ("LPR") system for **SUBJECT VEHICLE 7** and **SUBJECT VEHICLE 8** from September 26, 2026, to October 6, 2026.

147. On September 27, 2026 at 2:52 p.m., **SUBJECT VEHICLE 7** was observed on an LAPD LPR camera parked at the southwest corner of 5th Street and Crocker Street. At the time, the 5381 Number's cell-site GPS location showed it was in the same area.

148. On September 30, 2026, at 11:37 a.m., **SUBJECT VEHICLE 7** was observed on an LAPD LPR camera parked at the southwest corner of 5th Street and Crocker Street. At the time, the 5381 Number's cell-site GPS location showed it was in the same area.

149. On September 26, 2026, at 11:11 a.m., **SUBJECT VEHICLE 8** was observed on an LAPD LPR camera parked at the southwest corner of 5th Street and Crocker Street. At the time, the 5381 Number's cell-site GPS location showed it was in the same area.

150. On September 27, 2026, at 8:20 a.m., **SUBJECT VEHICLE 8** was observed on an LAPD LPR camera parked at the southwest corner of 5th Street and Crocker Street. At the time, the 5381 Number's cell-site GPS location showed it was in the same area.

151. Based on my training and experience, I believe that THOMAS utilizes **SUBJECT VEHICLE 7** and **SUBJECT VEHICLE 8** to further his drug sales activities at the intersection of 5th Street and Crocker Street as evidenced by his prior arrest by the LAPD on March 19, 2026, the controlled narcotics purchase on August 5, 2026, and his continued presence at the intersection.

### F. Target 6: Dwayne RICHARDS

#### 1. April 14, 2026: Arrest of Dwayne RICHARDS and Execution of Search Warrant at RICHARDS' Residence

152. On April 14, 2026, LAPD Central NED conducted an operation involving RICHARDS, who was known for conducting drug sales at the intersection of 5th Street and Crocker Street. Prior to the start of the operation, LAPD Central NED Officer Gatlin authored a search warrant signed by the Honorable Thomas Griego, Judge for the Superior Court of Los Angeles County, for the search of RICHARDS's residence, located at 9413 South

Spring Street, Unit 110, Los Angeles, California, 90003, i.e., **SUBJECT PREMISES 10**, and RICHARD's vehicles, to include:

a. **SUBJECT VEHICLE 11;**[21]

b. **SUBJECT VEHICLE 12;**[22]

c. **SUBJECT VEHICLE 13;**[23]

d. **SUBJECT VEHICLE 14;**[24] and

e. **SUBJECT VEHICLE 15;**[25], and

f. Any other vehicle related to RICHARDS.

153. That morning, LAPD Central NED investigators, with support from uniformed officers, set up surveillance at the intersection of 5th Street and Crocker Street. Based on Central NED's investigation, RICHARDS habitually arrived at the location in the early morning hours to sell narcotics.

154. At approximately 7:00 a.m., Central NED Officer Gatlin observed a grey 2018 Lexus ES 300 bearing California license plate 9MFB117 (the "Grey Lexus") parked on the east side of Crocker Street south of 5th Street. Officer Gatlin

---

[21] A search of the California DMV database reveals that **SUBJECT VEHICLE 11** is registered to RICHARDS with a registered address of **SUBJECT PREMISES 10.**

[22] A search of the California DMV database reveals that **SUBJECT VEHICLE 12** is registered to RICHARDS with a registered address of **SUBJECT PREMISES 10.**

[23] A search of the California DMV database reveals that **SUBJECT VEHICLE 13** is registered to RICHARDS with a registered address of **SUBJECT PREMISES 10.**

[24] A search of the California DMV database reveals that **SUBJECT VEHICLE 14** is registered to RICHARDS with a registered address of **SUBJECT PREMISES 10.**

[25] A search of the California DMV database reveals that **SUBJECT VEHICLE 15** is registered to RICHARDS with a registered address of **SUBJECT PREMISES 10.** Notably, although the registered address is **SUBJECT PREMISES 10**, the record for this vehicle does not specify a specific unit number.

observed RICHARDS standing near the vehicle with four other individuals, including THOMAS.

155. At the time, the Grey Lexus was registered to RICHARDS at **SUBJECT PREMISES 10.** A check of the California DMV database shows that the Grey Lexus has since been sold.

156. After observing RICHARDS standing next to the Grey Lexus at the intersection of 5th Street and Crocker Street, Central NED Officer Gatlin directed uniformed officers to detain RICHARDS as well as the other individuals surrounding him, pending service of a search warrant at **SUBJECT PREMISES 10.** One of the individuals detained was THOMAS.

157. Officer Gatlin located the keys to RICHARDS' Grey Lexus on RICHARDS' person and conducted a search of the vehicle pursuant to the search warrant. While searching the Grey Lexus, Officer Gatlin found the following items of narcotics evidence in the trunk of the vehicle:

a. White powder resembling cocaine weighing approximately 1,271.35 gross grams;

b. Two large off-white solids resembling cocaine base weighing approximately 425.65 gross grams (DEA Case Number: LH-26-0050, DEA Evidence Item Number: Exhibit 33);

c. A small plastic bindle containing a white powder resembling cocaine weighing approximately 7.45 gross grams (DEA Case Number: LH-26-0050, DEA Evidence Item Number: Exhibit 38);

d. A brown paper bag containing an off-white solid substance resembling cocaine base weighing approximately 79.80

gross grams (DEA Case Number: LH-26-0050, DEA Evidence Item Number: Exhibit 34).

158. LAPD Forensic Science Division testing of the white powder resembling cocaine verified that it was a mixture of cocaine with a net weight of 1,006.71 grams.

159. DEA Southwest Laboratory testing of Exhibit 33 verified that it was a mixture and substance containing cocaine base with a net weight of 394.0 grams.

160. DEA Southwest Laboratory testing of Exhibit 38 revealed that it was a mixture and substance containing cocaine base with a net weight of 5.09 grams.

161. For officer safety reasons related to the pending execution of a search warrant at **SUBJECT PREMISES 10**, Central NED Officer Michael Mann asked RICHARDS if anyone else was at the residence. RICHARDS advised Officer Mann that his wife might be home and stated that she does not have anything to do with this and that everything in the house belongs to him.

162. A search of **SUBJECT PREMISES 10** - a one bedroom, one bathroom apartment - led to the seizure of the following items:

a. A razor blade and white solids resembling cocaine base weighing approximately 13.97 gross grams (DEA Case Number: LH-26-0050, DEA Evidence Item Number: Exhibit 39);

b. Two clear plastic bindles of an off-white substance resembling cocaine base weighing approximately 16.23 gross grams (DEA Case Number: LH-26-0050, DEA Evidence Item Number: Exhibit 40);

c. Four glass beakers with white residue resembling cocaine;

d. A brown cutting board with white residue resembling cocaine;

e. Multiple boxes of live ammunition from shoe boxes inside the bedroom, including live .38 caliber rounds and live .25 caliber rounds;

f. A black firearms box containing three 9mm magazines on the ground next to the dresser;

g. A Smith and Wesson, model Airweight, .38 SPL +P caliber revolver, bearing serial number DJS7867, loaded with five .38 caliber rounds; and

h. Approximately $35,000 in U.S. currency.

163. DEA Southwest Laboratory's testing of Exhibit 39 verified that it was a mixture and substance containing cocaine base with a net weight of 10.51 grams.

164. DEA Southwest Laboratory's testing of Exhibit 40 verified that it was a mixture and substance containing cocaine base with a net weight of 11.57 grams.

165. Based on a review of RICHARDS' criminal history records, I know that RICHARDS has prior felony convictions and is a person prohibited from owning or possessing firearms. RICHARDS's felony convictions include:

a. A 2007 conviction for transporting and selling a narcotic or a controlled substance in violation of California Health and Safety Code Section 11352, for which he was sentenced to four years in state prison.

b. A 2010 conviction for possession of narcotics or a controlled substance in violation of California Health and Safety Code Section 11350, for which he was sentenced to 16 months in state prison.

c. 2017 convictions for conspiracy in violation of California Penal Code Section 182(a)(1) and possession of a controlled substance for sale in violation of California Health and Safety Code 11351.5, for which he was sentenced to four years in state prison and one year in state prison, respectively.

d. During the execution of the search warrant described above, Central NED investigators also seized **SUBJECT DEVICES 7**, **8**, and **9**.

### G. Target 7: Tyzarioun GRIMSLEY

#### 1. August 19, 2026: Purchase of Cocaine Base from GRIMSLEY

166. On August 19, 2026, members of HIDTA Groups 44 and 52 conducted a buy/walk operation at the intersection of 5th Street and Crocker Street utilizing CS-2, who was wearing covert audio and video recording equipment.

167. CS-2 was dropped off by investigators near the intersection of 5th Street and Crocker Street and instructed to purchase $75 worth of narcotics from inside **SUBJECT PREMISES 6.** CS-2 walked to **SUBJECT PREMISES 6** and approached a man wearing a baby blue baseball cap, white tank top and grey shorts, later identified as GRIMSLEY.

168. Investigators observed as, after a short conversation with CS-2, GRIMSLEY walked west, crossing the street to the west curb of Crocker Street, where GRIMSLEY appeared to enter a grey tent located on the west sidewalk on Crocker Street south of 5th Street, i.e., **SUBJECT PREMISES 11.**[26]

169. After a few seconds, GRIMSLEY walked back to CS-2. Following a short interaction with GRIMSLEY, CS-2 returned to investigators and relinquished custody of approximately 33.8 gross grams of suspected cocaine base purchased from GRIMSLEY.

170. A debrief of CS-2 following the controlled transaction revealed that CS-2 approached GRIMSLEY at **SUBJECT PREMISES 6** and asked to purchase two cigarettes and $75 worth of cocaine base from GRIMSLEY. CS-2 observed GRIMSLEY walk away but did not see where he went. GRIMSLEY returned a short time later and CS-2 paid $75 in exchange for suspected cocaine base (DEA Case Number: LH-26-0050, Evidence Item: Exhibit 22).

171. DEA Southwest Laboratory testing verified that the suspected cocaine base was a mixture containing cocaine base with a net weight of 2.63 grams.

172. A review of CS-2's body-worn audio and video recording equipment revealed that CS-2 entered **SUBJECT PREMISES 6**, engaged in banter with GRIMSLEY, and then ordered $75 worth of narcotics from GRIMSLEY. GRIMSLEY got up from his seat and walked outside the view of CS-2's body-worn recording device as CS-2 continued to banter with an unknown black male ("UM-3").

[26] **SUBJECT PREMISES 11** is located next to and north of **SUBJECT PREMISES 8**, across the street from **SUBJECT PREMISES 6.**

While waiting for GRIMSLEY to return, CS-2 takes a seat in **SUBJECT PREMISES 6.**

173. A short time later, GRIMSLEY is then observed on CS-2's body-worn recording device walking eastbound across the street back towards **SUBJECT PREMISES 6** with an object balled in his hands. GRIMSLEY approaches CS-2 and finishes the transaction before CS-2 departs the area.




*Screenshot of CS-2's body-worn recording device capturing GRIMSLEY*



*Screenshot of CS-2's body-worn recording device capturing GRIMSLEY walking east back to CS-2 with object balled up in his hand*

174. At approximately 2:10 pm, LAPD uniformed Officers Duenas and Acosta walked up to the man wearing a baby blue baseball cap, white tank top and grey shorts at **SUBJECT PREMISES 6** and positively identified him as GRIMSLEY.

175. Based on my training and experience, conversations held with Central NED Detective Jorge Trejo and Officer Gatlin, and the investigation to date, I believe that THOMAS, MCINTYRE, MOSLEY, and GRIMSLEY utilize **SUBJECT PREMISES 6, SUBJECT PREMISES 8,** and **SUBJECT PREMISES 11** interchangeably to conceal the sales of narcotics as evidenced by GRIMSLEY conducting the narcotics sale from **SUBJECT PREMISES 6,** but

walking across the street to **SUBJECT PREMISES 11** to retrieve the narcotics sold to CS-2.

### H. Target 8: Davied RIVERS

#### 1. August 26, 2026: Attempted Buy/Bust of RIVERS

176. On August 26, 2026, LAPD Newton NED attempted a buy/bust operation involving RIVERS at the intersection of Crocker Street and Agatha Street in Skid Row.

177. An LAPD informant ("CS-3")[27], utilizing body worn audio and video recording equipment, was instructed to purchase narcotics at the intersection of Crocker Street and Agatha Street. CS-3 approached an individual on a bicycle, later identified as RIVERS, held a short conversation, and advised RIVERS that CS-3 was looking to purchase $20 of fentanyl. RIVERS led CS-3 southbound to RIVERS' tent, a grey and blue tent located at the southwest corner of Crocker Street and Agatha Street, and led CS-3 inside. RIVERS then began to put on latex gloves and a mask. CS-3 handed Rivers $20 in exchange for a small aluminum foil bindle containing an off-white substance resembling fentanyl with a gross weight of 1.02 grams.

178. CS-3 returned to investigators and relinquished custody of the suspected narcotics.

179. LAPD Forensic Science Division testing of the off-white substance resembling fentanyl confirmed that the

[27] CS-3 is an LAPD confidential informant since August 2026. To date, CS-3 has conducted 11 controlled narcotics purchases and has proven to be reliable, corroborated by body-worn recordings, and has earned $2,410. CS-3 is primarily motivated by monetary compensation. CS-3's criminal history includes vandalism, shoplifting, and driving under the influence of alcohol or drugs.

substance was a mixture containing fentanyl with a net weight of 0.22 grams.

180. As uniformed officers began approaching the tent to detain RIVERS, he fled the tent and escaped. During a security sweep of the tent, officers discovered additional suspected drugs in plain view, namely:

a. An aluminum foil bindle containing off-white solids resembling fentanyl with a gross weight of 1.05 gross grams;

b. Two brown glass vials containing brownish liquid resembling phencyclidine with a gross weight of 9.1 grams;

c. Numerous glass vials with brownish residue resembling phencyclidine;

d. An aluminum foil bindle containing an off-white solid resembling fentanyl with a gross weight of 0.71 grams; and

e. An off-white solid resembling rock cocaine with a gross weight of 0.65 grams.

181. LAPD Forensic Science Division testing of the aluminum foil bindle containing the off-white solid resembling fentanyl confirmed that the substance was a mixture containing fentanyl with a net weight of 0.17 grams. LAPD Forensic Science Division testing of the off-white solid resembling rock cocaine confirmed that the substance was a mixture containing cocaine base with a net weight of 0.055 grams.

182. Following LAPD Newton NED’s controlled narcotics purchase operation, LAPD Central NED Officer Mann reviewed CS-

3's body-worn video recording and positively identified RIVERS from previous law enforcement contact with RIVERS in Central NED's area of operation.

### I. Target 9: Maceo George HENDERSON

#### 1. September 23, 2026: Arrest of HENDERSON

183. On September 23, 2026, members of HIDTA Groups 44 and 51 were conducting a surveillance operation in the vicinity of the intersection of 5th Street and Crocker Street in the Skid Row area of Downtown, Los Angeles.

184. TFO Julio Moreno, who was in plain clothes in an unmarked undercover vehicle, was parked on Crocker Street along the west sidewalk, just north of 5th Street, facing southbound. At approximately 6:00 p.m., TFO Moreno observed a bald black male wearing prescription glasses, a grey shirt, dark grey pants, and black shoes riding an electric scooter in the vicinity. The subject was later identified as Maceo George HENDERSON.

185. HENDERSON rode the scooter around the area multiple times and briefly left the area before returning. At one point, TFO Moreno observed HENDERSON park his scooter on the passenger of his undercover vehicle and walk to the southwest corner of the intersection of 5th Street and Crocker Street.

186. TFO Moreno observed HENDERSON enter **SUBJECT VEHICLE 17,**[28] make a U-turn, and head northbound on Crocker Street from 5th Street, then make another U-turn and ultimately park in front of TFO Moreno's vehicle.

187. TFO Moreno was concealed in the rear seat of his vehicle and had a clear and unobstructed view of **SUBJECT VEHICLE 17.** TFO Moreno watched as HENDERSON exited **SUBJECT VEHICLE 17** and entered a blue tent that was located near where he parked his scooter. HENDERSON was in the tent for a few minutes before exiting.

188. After exiting the tent, HENDERSON went to the rear passenger door of **SUBJECT VEHICLE 17** and retrieved a grey sweatshirt from the rear passenger seat. As he was putting the sweatshirt on, an unidentified black female ("UF-3") and an unidentified black male ("UM-4") approached HENDERSON and engaged him in conversation.

189. TFO Moreno observed as HENDERSON gave UF-3 a white substance from a pill container, and in return, UF-3 gave him something back. After the transaction with the female, TFO Moreno observed HENDERSON conduct a similar transaction with UM-1.

190. Based on TFO Moreno's training and experience in narcotics investigations, TFO Moreno identified these actions as hand-to-hand narcotics transactions. Furthermore, TFO Moreno

---

[28] A check of the California Department of Motor Vehicles ("DMV") database reveals that **SUBJECT VEHICLE 17** is registered to HENDERSON with a registered address of 4340 West Adams Boulevard, Apartment U, Los Angeles, California, 90018.

observed that HENDERSON was wearing black latex gloves during the transactions. Based on my conversations with TFO Moreno on his training and experience, TFO Moreno knows that drug dealers will often wear latex gloves to protect themselves from accidental absorption of the narcotics through their skin.

191. UF-3 and UM-4 left the area immediately following the transaction. Upon UF-3 and UM-4's departure, HENDERSON used his cellular telephone then departed the area on his scooter for approximately five minutes before returning.

192. Upon his return, HENDERSON parked his scooter approximately two feet from TFO Moreno's vehicle and went back into the blue tent and momentarily remained out of sight.

193. HENDERSON then exited the blue tent and walked to the rear of **SUBJECT VEHICLE 17.** At the rear of **SUBJECT VEHICLE 17,** HENDERSON reached into his sweatpants pocket and utilized the key fob to open the trunk to the vehicle.

194. TFO Moreno observed HENDERSON reach into the trunk of **SUBJECT VEHICLE 17** and remove several plastic bindles



*Screenshot of video taken by TFO Moreno of HENDERSON manipulating items in the trunk of SUBJECT VEHICLE 17*

containing a white substance and place several of them into a white pill container.

195. TFO Moreno noticed that the plastic bindles containing a white substance were already wrapped and stored in a plastic bag, which was inside a purple drawstring backpack.

196. HENDERSON then placed the pill container into his left sweatpants pocket, rearranged the purple drawstring backpack and plastic bag in his trunk, and closed the trunk to **SUBJECT VEHICLE 17.** TFO Moreno observed that HENDERSON was still wearing black latex gloves, most likely to protect himself from absorbing narcotics.

197. Based on observations made by TFO Moreno, investigators contacted LAPD Central NED to respond to the area with uniformed LAPD officers.

198. After closing the trunk to **SUBJECT VEHICLE 17,** HENDERSON retrieved his scooter from near TFO Moreno's vehicle and rode southbound on Crocker Street. LAPD Central NED officers directed uniformed LAPD Central Division RESET Officers Duenas and Maravilla to take HENDERSON into custody, which they did without incident at the intersection of Crocket Street and 6th Street.

199. Officer Duenas searched HENDERSON's person and recovered from HENDERSON's left front pocket the white pill case containing numerous off-white solids resembling cocaine base weighing approximately 23.18 gross grams. Officer Duenas also recovered US currency totaling $150.

200. LAPD Central NED officer responded to **SUBJECT VEHICLE 17** and conducted a search of the vehicle. Inside, Central NED Officer Gatlin recovered a black bag which contained a Taurus, model PT 111 Millennium Pro, 9mm caliber semi-automatic pistol, bearing serial number TAM89373 from the trunk of **SUBJECT VEHICLE 17.** The firearm was loaded with a magazine containing eight rounds of 9mm ammunition.

201. Based on a review of HENDERSON's criminal history revealed, I know that he is a convicted felon and is prohibited from owning or possessing firearms or ammunition. HENDERSON's felony convictions include:

202. A 1988 conviction for first degree burglary in violation of California Penal Section 459, for which he was sentenced to six years in state prison;

203. A 1993 conviction for second degree burglary in violation of California Penal Code section 459, for which he was sentenced to two years in state prison; and

204. A 2006 conviction for possession of a controlled substance in violation of California Health and Safety Code Section 11350, for which he was sentenced to 16 months in state prison;

205. A 2007 conviction for possession of a controlled substance in violation of California Health and Safety Code Section 11350, for which he was sentenced to three years in state prison; and

206. A 2013 conviction for transporting or selling a controlled substance in violation of California Health and

Safety Code Section 11352, for which he was sentenced to four years in state prison.

207. Central NED Officer Mann recovered, among other items, the following from the trunk of **SUBJECT VEHICLE 17:**

a. Clear plastic baggies containing off-white solids resembling cocaine base weighing approximately four gross grams;

b. $2,995 in U.S. currency; and

c. A small grey scale with white residue.

208. LAPD Forensic Science Division testing of the numerous off-white solids resembling cocaine base found on HENDERSON's person confirmed that they were each a mixture containing cocaine base with a combined net weight of 21.89 grams. LAPD Forensic Science Division testing of the clear plastic baggies containing off-white solids resembling cocaine base found in the trunk of **SUBJECT VEHICLE 17** confirmed that the baggies each contained a mixture containing cocaine base with a combined net weight of 2.27 grams.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

209. I have supervised or participated in numerous controlled drug/gun purchase operations using informants; monitored multiple gang/narcotics related Title III wiretap interceptions; supervised or participated in numerous physical and electronic surveillances; and have supervised or participated in numerous state and federal arrests for drug and violent crime related offenses.

210. I have also supervised and assisted in the supervision of the activities of several informants who have

provided information, collected gang/drug intelligence, and conducted controlled purchase operations, resulting in federal and state prosecution of gang, drug, and/or firearm offenders.

211. Based upon my training and experience with the FBI, as well as conversations I have had with other agents and law enforcement officers who specialize in narcotics investigations, I am knowledgeable in the methods and modes of narcotics trafficking operations and the language patterns typical of narcotics trafficking, and I am familiar with the methods utilized in narcotics trafficking operations and the trafficking patterns employed by narcotics organizations.

212. I know narcotics traffickers often use coded language when discussing narcotics trafficking activities. I have participated in narcotics investigations where I have deciphered monitored calls or recordings containing coded language. I have become familiar with many of the methods of operation used by narcotics traffickers and money launderers. I know narcotics traffickers and money launderers often require the use of one or more communication facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances.

213. I know international and domestic narcotics trafficking and money laundering organizations often depend on maintaining timely long-distance and local connections between original sources of supply and those down the organizational

chain. Communication facilities such as cellular telephones enable narcotics traffickers and money launderers to maintain contact with money launderers, smugglers, narcotics associates, narcotics suppliers, and narcotics customers.

214. I also know that narcotics traffickers and money launderers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications.

215. Based on my training and experience investigating drug-trafficking offenses and my familiarity with similar investigations conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.

b. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. These records are often maintained where drug traffickers have ready access to them, such as on their cell

phones and other digital devices, and in their residences or stash houses, and in their vehicles. They often maintain these records in their residences, stash houses, digital devices, or vehicles for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. Such records are invaluable to narcotics traffickers and such records are rarely discarded. Such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

d. Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences, stash houses, and vehicles. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

e. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

f. Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. To do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences, stash houses, and/or digital devices of individuals involved in narcotics trafficking.

g. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences, vehicles, or stash houses. Additionally, individuals

involved in narcotics trafficking often amass and maintain assets at their residences or stash houses, which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

h. Residences, stash houses, and vehicles used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises and vehicles.

i. Drug traffickers often use multiple vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises, or to drive to areas to transfer drugs from one vehicle to another, into residences or stash houses, or to meet with co-conspirators.

j. Drug traffickers also regularly carry firearms during and in connection with their drug trafficking activities. For example, drug traffickers may possess a firearm to protect their stash or fend off robbery attempts. In my career, I have regularly encountered drug traffickers possessing firearms for a similar purpose.

k. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, at their stash houses, in their vehicles, or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging

materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

l. Individuals involved in drug trafficking often maintain several digital devices, including cellular telephones, computers, tablets, and other communication devices, at their residences, residences of associates, stash houses, places of business, in their vehicles, and/or on their person for the purpose of arranging transactions. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones" or "burner phones," for actual voice communications. Persons attempting to arrange for the sale, purchase, transportation and manufacture of controlled substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals. Further, it has been my experience that those involved in drug trafficking maintain contact information for other coconspirators in their cellular telephones.

m. The above-described documents are often possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers

whether or not the dealer is in possession of any drugs or chemicals at any given moment.

216. Based on my training and experience investigating drug-trafficking, and based on the facts recounted above, I submit that there is probable cause to believe that the targets have violated 21 U.S.C. § 841(a)(1)(Possession with the Intent to Distribute, and Distribution of, a Controlled Substance). I further submit that there is probable cause to believe that evidence of the Subject Offenses will be found at the SUBJECT PREMISES, which have been accessed by targets, and of which I believe are used for storing and trafficking drugs. I further submit that there is probable cause to believe that evidence of the Subject Offenses will be found on persons found within the SUBJECT PREMISES as well as any digital devices found therein. Such evidence is likely to include evidence of targets' participation in drug trafficking, as well as participating in drug trafficking at the SUBJECT PREMISES, in vehicles, and elsewhere; the identities and involvement of drug customers and any other co-conspirators; the identities of sources of supply; the manner and means by which targets may launder or conceal the proceeds of their drugs and traffic drugs; and the locations of other places where they may keep, conceal, or distribute drugs.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[29]

217. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

[29] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

218. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

219. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user’s fingers on a device’s fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the TARGETS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of the TARGETS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

220. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

221. For all the reasons described above, there is probable cause to believe that the TARGETS have committed a violation of Title 21, United States Code, Section 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance).

222. Additionally, there is probable cause to believe that the items listed in Attachment B-1, which constitute evidence, fruits, and instrumentalities of violations of the **Subject Offenses-1**, will be found at **SUBJECT PREMISES 6** and **11**, and in **SUBJECT VEHICLES 3, 4** and **5,** as described in Attachments A-06, A-11, A-15, A-16, and A-17.

223. Additionally, there is probable cause to believe that the items listed in Attachment B-2, which constitute evidence, fruits, and instrumentalities of violations of the **Subject Offenses-2**, will be found at **SUBJECT PREMISES 1, 2, 3, 5, 7, 8, 9, 10,** and **12,** in **SUBJECT VEHICLES 1, 2, 6, 7, 8, 11, 12, 13, 14, 15, 16,** and **17,** as described in Attachments A-01, A-02, A-03, A-05, A-07, A-08, A-09, A-10, A-12, A-13, A-14, A-18, A-19, A-20, A-23, A-24, A-25, A-26, A-27, A-28, and A-36.

224. Additionally, there is probable cause to believe that the items listed in Attachment B-3, which constitute evidence, fruits, and instrumentalities of violations of the **Subject Offenses-3**, will be found in the **SUBJECT DEVICES**, as described in Attachment A-29.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6th day of October 2026.

HON. CHRISTINA T. SHAY
UNITED STATES MAGISTRATE JUDGE